UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARC BOYER,                              )
                    Plaintiff,           )
                                         )          No. 1:15-cv-888
-v-                                      )
                                         )          HONORABLE PAUL L. MALONEY
MARK PETERSEN & BRYAN CAMPBELL,          )
                    Defendants.          )
_____ )

## OPINION

On a late summer day in 2014, the Village of Vicksburg received a non-emergency call. Denise Boyer—a local resident who was less than one month away from her divorce being finalized with her then (separated) spouse, Marc Boyer—was "upset" that Marc had "cancelled" an appointment she had made to retrieve some of her personal belongings at Marc's (exclusive) residence on Wilson Street, and Denise was determined to go there regardless. Denise was not certain whether Marc was going to be there—but she requested the police accompany her.

Officer Mark Petersen, no stranger to the Boyers or their disputes, responded to the call—and summoned the Chief of the nearby Village of Schoolcraft, Bryan Campbell, as back-up. Officer Petersen would later claim he was simply acting as a "peace officer" (despite the absence of exigent circumstances), but he went a step further.

Officer Petersen accompanied Denise Boyer into Marc Boyer's residence and proceeded to "search for Marc"—a fairly intrusive search, in Mr. Boyer's light—"in the garage

area," "through[out] the ground-level floor," "in the garage area," and even "upstairs."[1] As alleged, Denise Boyer removed several items, some priceless, owned by Marc Boyer.

The trouble for Officer Petersen is that despite his legal arguments, he knew all of the following facts at the time of the search: Marc and Denise Boyer were separated and nearly divorced; Marc was the only resident of the home on Wilson Street, and Denise lived at a separate residence on the "corner of Spruce and Vine" Streets; Marc "did not want [Officer Petersen] to let [Denise] on to the property that he was staying at or in the house [on Wilson Street] without permission"; Marc had "cancelled" an "appointment" for Denise to visit and retrieve some belongings because he could not be present; and Marc did not give consent for Denise (or the police) to enter his residence on that day.

Officer Petersen cites a single justification for relying on Denise Boyer's "consent" to search Marc Boyer's residence for Marc's person: Denise's name was on the deed to the home.

True, the facts of no other case directly mirror the facts of this case—but that's perhaps with good reason. Officer Petersen's unconstitutional search for Marc Boyer's person at Boyer's residence (through his erroneous reliance on Denise Boyer's "consent") was so clearly wrong under established law that "'every reasonable offic[er] would have understood that what he [was] doing violate[d] [Marc Boyer's] right'" to be free from an unreasonable search. *T.S. v. Doe*, 742 F.3d 632, 635 (6th Cir. 2014) (second and third alterations in original) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)).

---

[1] The same cannot be said for Chief Campbell, who rode into town to provide moral support to this misguided mission and barely set his foot inside the "threshold of the front door."

Indeed, other reasonable village officers rejected Denise's identical invitation just a few weeks later, understanding and memorializing clearly established law in a police report: "Denise explain[ed] that she plans on entering the home on Wilson Street at 12:03 am on October 1 to get [her] stuff, [as] [Marc] is supposed to be out by then, so [s]he ha[s] a right to be there," but "[w]e explained to [Denise] that she cannot illegal [sic] enter the home while [Marc] is still residing there."

Accordingly, while Chief Campbell (who played a minimal role by providing inter-jurisdictional back-up) is entitled to qualified immunity, Officer Petersen is not.

## I.   BACKGROUND

Plaintiff Marc Boyer and his now ex-wife, Denise Boyer (whom had married in 2006), were close to finalizing a tumultuous divorce at the time of the events in question. (ECF No. 33-3 at PageID.154.)

At some point in the early half of 2014, Marc and Denise began residing in separate residences and had begun the divorce process. Consistent with the separation, Marc lived by himself at 103 Wilson in Vicksburg, Michigan, despite the fact that Denise was listed as the owner on the deed. (*Id.*) (Denise lived at a separate residence.) At least one of the Officers, Mark Petersen, knew Mr. Boyer resided at 103 Wilson alone based upon at least one previous interaction. (ECF No. 33-5 at PageID.170.)

<u>Facts from Marc Boyer's Sworn Testimony and the Video</u>

Marc Boyer, not present during the alleged constitutional violation and trespass, provides his own factual account for how at least Officer Petersen knew Marc did not, as the

sole resident of the home, give permission for Denise Boyer (or the police) to enter his residence without prior notice, arrangements, and his presence.

Marc Boyer's sworn testimony unambiguously states: "As of August 13, 2014, I had been living separately from my estranged wife Denis for approximately two months. I resided at 103 Wilson Street. Denise resided on Spruce Street in the Village of Vicksburg. Denise was not welcome in my residence, and I only allowed her to stop by with a day's notice." (ECF No. 33-1 at PageID.148.)

Marc Boyer also alleged that he told Officer Petersen that Denise had to make arrangements prior to showing up to the home, and "Officer Petersen ma[de] a statement to the effect that he would not enter the house at 103 Wilson or allow Denise to enter the house unless you were present." (ECF No. 33-3 at PageID.154.) He asserted that he recorded an exchange on video at some time in the early summer of 2014 that supported his assertion.

Defendants are correct to a degree—part of Marc Boyer's factual account above is contradicted by the video.

The video depicts Denise Boyer showing up to the residence wanting to retrieve some of her property and Marc Boyer expressing displeasure that she showed up without notice; both call the police.

"She does not live here," Marc Boyer remarks to the dispatcher. At one point, he says, "When we are divorced, I will gladly get out of this house." Marc and Denise exit the house.

Marc Boyer makes various assertions throughout the beginning of the video: "I'm here; she's moved out"; "I've asked her when she comes, to make arrangements with me";

4

"I want a personal protection order"; "if she needs something, I don't object to her coming"; "all she needs to do is let me know she's coming"; "she chose to move out, and if I have to get a personal protection order, I'll get one." (ECF No. 29-1.)

After making initial contact, Officer Petersen asks: "She has moved out and is living with her sister for the past ten days?" "Yes," states Marc Boyer. "Because there's a little grey area here on whether—being that you guys are still married—I'll have to check to see. Even if she has moved out, being that you guys are still married, she might still have the right to come back here," Officer Petersen responds. "Like with landlord/tenant, you know, it's different." "Exactly," Mr. Boyer responds. "If you're renting out a room, or if you have a buddy move in, and he moved out, you have to go through the eviction process. . . . It may be the best thing to do in the future until you guys are divorced, and everything is all divvied up, maybe the best thing is if she's going to come by here to get things, to avoid problems, maybe the best thing to do would be to have one of us come by and act as a peace officer."

Mr. Boyer responds: "I have no issue; there's nothing of hers that I want; she just doesn't need to be showing up saying that, well, 'we're going to do this' when you're not here, and then call the cops; and I tell her, 'you're not just going to show up and do this,' and threaten me and then standing there yelling at me."

"She's going to get some of the property out of the house, okay?" Mr. Boyer responds: "I've never had an issue with that—I've asked her to call and make arrangements, tell me what she's taking so she's not taking any of my own property, that's all I've ever asked for."

During this video, Marc Boyer stands outside while Denise apparently removes her property. He at one point explains to the officer that she can't carry anything out of the house that's heavy because that stuff is "all community property."

At one point, Officer Petersen suggests: "And maybe, Marc, take the initiative if you see her pulling in, and she doesn't make arrangements with you, just give us a call." "I will," Marc responds.

Contrary to Marc Boyer's testimony, at no point does Officer Petersen promise Mr. Boyer that he will not show up to the house. However, at no point does Officer Petersen ever indicate that he would enter the home either, nor did he at the time. And Marc Boyer met him outside and never suggested that Officer Petersen could do anything other than be on standby, if needed. Moreover, when viewing the inferences drawn from the video in the light most favorable to Marc Boyer, the Officer is clearly on notice that Marc Boyer does not "consent" to any entry by Denise Boyer or an officer without *Marc's* express consent and presence.

A jury could view the video and conclude that Officer Petersen: a) knew that only Marc Boyer resided at the home; b) stated that if Denise Boyer showed up, he should call the police; and c) Marc Boyer did not consent to Denise Boyer showing up unannounced and without his permission or presence.

In addition to the video, however, Mr. Boyer's testimony, along with the divorce record, reveals a few other facts.

First, the final judgment of divorce entered less than a month after the incident in question, on September 12, 2014. (The alleged unconstitutional acts occurred on August 13,

2014.) Accordingly, Mr. Boyer testified to the fact that "[t]he Judge and those people at the family court told us that, that she had her residence, I had my residence [until everything was finalized]." (ECF No. 28-2 at PageID.98.) In Marc Boyer's view, "[Denise Boyer] had no reason to come into there . . . because it says clearly in the paperwork that her attorney filed, we were not to remove any material, we were not to do any of those things." (*Id.* at PageID.98.) Thus, although Defendants note that no formal order exists on the public docket, there are several hearings referenced on that docket that may support Mr. Boyer's contention that the "status quo"—both parties living in separate residences—was to be maintained during the pendency of the divorce proceedings.

The fact that Denise Boyer felt the need to make appointments with Marc Boyer only underscored the arrangement—and the Officers knew that she felt the need to make those arrangements.

However, the video does not sterilize Plaintiff's case, as Defendants contend. In fact, the video—only one of several contacts with the police—is neither necessary for Plaintiff's case nor sufficient for Defendant's qualified immunity defense.

Even putting the video and other record evidence aside, the Officers had a clear picture on the date of the alleged violation: viewing the evidence on that day in the light most favorable to Marc Boyer, Denise Boyer represented to Officer Petersen that she did not have authority to consent to a search of the residence without Marc's consent and an appointment.

<u>Facts from the Officers' Sworn Testimony</u>

On August 13, 2014, Denise Boyer called the police. Officer Petersen, on duty inside the Village Offices, was apparently directed by the Police Chief to handle the call. (ECF No.

33-5 at PageID.169.) Denise had expressed frustration to the police because, according to Officer Petersen's recollection, Marc Boyer "would make an appointment for [Denise] to come over and then he would cancel on her at the last minute." (*Id.* at PageID.171.) Accordingly, Denise "wanted [officers] to go there [to Marc's residence] while she retrieved the rest of her belongings." (*Id.* at PageID.171.) And "[s]he said she wasn't sure if [Marc] was gonna be there or not." (*Id.*)

Officer Petersen, thus, went on what he characterized as a "peace officer call"—and "requested a backup unit from County dispatch." (*Id.* at PageID.172.) Denise Boyer met him at Marc's residence with "a pickup truck [and] a trailer." (*Id.*) She also had brought her "father" and "sons" to assist with removing items from the residence. After Officer Petersen parked, he claims Denise "wanted [him] to go up to the residence, follow her into the residence to make sure—verify whether Marc was there or not"; or in other words, perform a "search for Marc." (*Id.*) Denise, according to Officer Petersen, resided separately two to three blocks away—and had been for some time. (ECF No. 33-5 at PageID.169.)

In the meantime, Chief Campbell—a Schoolcraft Police Chief—came as the requested back-up. He recalled being given a summary from Officer Petersen.

> He told me that Mrs. Boyer had contacted their office and wanted an officer to come stand by as a peace officer. That she was going through a divorce with Mr. Boyer. That they would be soon divorced, I believe in September; that they were currently separated. That there had been a couple two or three attempts at getting some property that they had both agreed on, and that Mr. Boyer wasn't available, and that it was that particular day on the 13th, that was supposed to occur, where she was supposed to get some of the property. And he said he wasn't gonna be available for the day. And she told Officer Petersen she was just gonna go get the property and she wanted an officer to stand by.

> And Officer Petersen told me that her name was still on the deed to the property, and that he wanted at least one other officer to be there.

(ECF No. 33-4 at PageID.163.)

Chief Campbell also testified that he knew, at least at some point, that Marc was the only resident at the home, and Denise was living elsewhere. (*Id.* at PageID.164.)

Officer Petersen, without calling the Vicksburg Chief or checking with any other officer in his Department, "accompanied [Denise] into the residence, which she unlocked with her own key." (ECF No. 33-5 at PageID.173.)[2] Officer Petersen did not knock—and neither did Denise Boyer. (*Id.*)

"[W]e went through . . . the ground-level floor," Officer Petersen testified. "I didn't follow her upstairs; she went upstairs and checked the upstairs area. And I believe I went down into the garage area with her, just to follow her down there to see if Marc was down in the garage area." (*Id.* at PageID.173.) Chief Campbell asserts that Officer Petersen accompanied Denise upstairs—as a factual dispute, the Court assumes Petersen did just that.

Chief Campbell "briefly" entered the home—"stepped just inside the threshold of the doorway," in his own words—because he "wanted to make sure that [he] was in hearing distance if there was any—if he encountered any issues or problems." (ECF No. 33-4 at PageID.165.)

After verifying Mr. Boyer was not there, Officer Petersen "st[ood] inside the front door," and Petersen remained at the residence for as much as 45 minutes. (ECF No. 33-5 at PageID.173.) The Officer "observed various items [Denise] was taking." (*Id.*) At no time did

---

[2] Chief Campbell does not recall a key—only that it was "unlocked somehow."

Petersen or any other officer attempt to make contact with Marc Boyer. When directly asked what justification existed for entering the home, the Officer replied: "I was accompanied by the owner of the home." (*Id.*)

He also testified he wanted to make sure "Denise was safe," but admitted that he had no evidence or prior history with Mr. Boyer to suggest he was, for example, armed or dangerous. (*Id.* at PageID.174.)[3] Denise did not assert that Marc was dangerous, either.

Troublingly, one month later, Denise Boyer once again attempted to have a "peace officer" escort her. Officer Petersen's report states "On today's date, Denise Boyer called VPD and requested a peace officer . . ." (*Id.* at PageID.178.) Officer Petersen recalled the facts: "Marc wouldn't let Denise in. She wanted to go in and take pictures of the house. After Marc wouldn't let her in, I suggested that they both try to work things out and communicate and, you know, **figure a date that would work for both of them**." (*Id.*)

At another point in time, village officers understood and memorialized what they believed to be clearly established law in a police report: "Denise explain[ed] that she plans on entering the home on Wilson Street at 12:03 am on October 1 to get [her] stuff, [as] [Marc] is supposed to be out by then, so [s]he ha[s] a right to be there," but **"[w]e explained to [Denise] that she cannot illegal [sic] enter the home while [Marc] is still residing there."** (ECF No. 33-5 at PageID.179.) In other words, Officer Petersen's handling of the entire situation that gave rise to this lawsuit was an aberration—his alleged understanding and behavior at that time was never replicated and, indeed, rejected on every other occasion.

---

[3] Officer Petersen did, however, know Mr. Boyer from "dealings with . . . either family fights or possible domestics . . . in a law enforcement capacity." (ECF No. 33-5 at PageID.168.)

## II.   LEGAL FRAMEWORK

Summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories and admissions, together with the affidavits, show there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008). The burden is on the moving party to show that no genuine issue of material fact exists, but that burden may be discharged by pointing out the absence of evidence to support the nonmoving party's case. *Bennett v. City of Eastpointe*, 410 F.3d 810, 817 (6th Cir. 2005) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The facts, and the inferences drawn from them, must be viewed in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

Once the moving party has carried its burden, the nonmoving party must set forth specific facts, supported by evidence in the record, showing there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *Matsushita*, 475 U.S. at 586. The question is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–252. The function of the district court "is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Resolution Trust Corp. v. Myers*, 9 F.3d 1548 (6th Cir. 1993) (citing *Anderson*, 477 U.S. at 249).

III.   **ANALYSIS**

A.     *Count I (Fourth/Fourteenth Amendment: Unconstitutional Search)*

i.     <u>Legal Framework: Qualified Immunity</u>

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

Qualified immunity is a legal question for the Court to resolve. *Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (citing *Elder v. Holloway*, 501 U.S. 510, 516 (1994)). When resolving a governmental employee's assertion of qualified immunity, the court determines (1) whether the facts the plaintiff has alleged or shown establishes the violation of a constitutional right, and (2) whether the right at issue was clearly established at the time of the incident. *Stoudemire v. Michigan Dep't of Corr.*, 705 F.3d 560, 567 (6th Cir. 2013) (citing *Pearson v. Callahan* 555 U.S. 223, 232 (2009)). Courts may examine the two prongs in any order, depending on the facts and circumstances of the case. *Id.* at 567-68.

Once the qualified immunity defense is raised, the plaintiff bears the burden of demonstrating both that the challenged conduct violates a constitutional or statutory right and that the right was so clearly established at the time that "'every reasonable officer would have understood that what he [was] doing violate[d] that right.'" *Doe*, 742 F.3d at 635 (second and third alterations in original) (quoting *al-Kidd*, 563 U.S. at 741). "Qualified immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions. When properly applied, it protects 'all but the plainly incompetent or

those who knowingly violate the law.'" *al-Kidd*, 563 U.S. at 743 (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

In determining whether a law is clearly established, ordinarily this Court looks to decisions of the Supreme Court and the Sixth Circuit. *Carver v. City of Cincinnati*, 474 F.3d 283, 287 (6th Cir. 2007); *see Andrews v. Hickman Cty., Tenn.*, 700 F.3d 845, 853 (6th Cir. 2012) ("When determining whether a constitutional right is clearly established, we look first to the decisions of the Supreme Court, then to our own decisions and those of other courts within the circuit, and then to decisions of other Courts of Appeals."); *see also Wilson v. Layne*, 526 U.S. 603, 617 (1999).

Although a prior case need not be directly on point, "existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

"This standard [ordinarily] requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (edits omitted) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458–59 (6th Cir. 1997)). However, the clearly established prong "depends substantially upon the level of generality at which the 'legal rule' is . . . identified." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987).

The Sixth Circuit recently affirmed that "reading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015). Accordingly, "[w]hile it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on point' is required." *Id.*

(citing *al-Kidd*, 563 U.S. at 741). "In fact, under *Hope*, a requirement that a prior case be 'fundamentally' or 'materially' similar to the present case would be too rigid an application of the clearly established inquiry.'" *Id.* (citing *Hope*, 536 U.S. at 741-42).

### ii.   Officer Petersen is not entitled to qualified immunity.

To begin, the Court concludes that Officer Petersen's entry into Marc Boyer's residence was a "search" for constitutional purposes. Defendants do not so dispute.

By his own sworn testimony, Officer Petersen "accompanied [Denise Boyer] into the residence," and rooted around "the ground-level floor" and "the garage area" (ECF No. 33-5 at PageID.173), and at least according to Chief Campbell, Officer Petersen "walk[ed] up the stairs to go upstairs." (ECF No. 33-4 at PageID.164.)[1] He performed the search to "see if Marc was [in the residence]." (ECF No. 33-5 at PageID.173.) And thereafter, he stayed "either inside the front door" or "on the stoop outside." (*Id.*) On the whole, this search—which was for *Marc Boyer's person*—was fairly intrusive, spanning across the entire residence.

Accordingly, the parties only agree on whether the facts, some in dispute, support the Officer's decision to enter the residence on the basis of Denise Boyer's "consent."

### a.   A reasonable officer in Officer Petersen's shoes could not have concluded that Denise Boyer had apparent or actual authority over the premises on the basis of "ownership" alone; accordingly, the search was unconstitutionally "unreasonable."

"It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S.

---

[1] A factual dispute exists here: Officer Petersen claims he did not go upstairs, while Chief Campbell claims Officer Petersen did. The factual dispute is viewed in the light most favorable to Marc Boyer, the plaintiff.

573, 586 (1980). "[A] search conducted without a warrant" is "'subject only to a few specifically established and well-delineated exceptions.'" *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (quoting *Katz v. U.S.*, 389 U.S. 347, 357 (1967)); *Clemente v. Vaslo*, 679 F.3d 482, 489 (6th Cir. 2012).

One of those exceptions, the only one advanced in this case, is "consent." *See id.*

"The Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an *occupant* who shares, or is reasonably believed to share, authority over the area in common with a *co-occupant* who later objects . . . ." *Georgia v. Randolph*, 547 U.S. 103, 106 (2006) (emphasis added).

Over forty years ago, the Supreme Court surveyed and mapped the legal landscape with respect to third-party consent that Defendants now contend is unclear:

> [T]he voluntary consent of any joint occupant of a residence to search the premises jointly occupied is valid against the co-occupant . . . .
>
> This Court left open, in *Amos v. United States*, 255 U.S. 313, 317 (1921), the question whether wife's permission to search the residence in which she lived with her husband could 'waive his constitutional rights,' but more recent authority here clearly indicates that the consent of one who possesses common authority over premises or effects is valid against the absent, nonconsenting person with whom that authority is shared.
>
> Common authority is, of course, not to be implied from the mere property interest a third party has in the property. The authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements, see *Chapman v. United States*, 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another), *Stoner v. California*, 376 U.S. 483 (1964) (night hotel clerk could not validly consent to search of customer's room) but rests rather on *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is *reasonable to recognize that any of the co-*

*inhabitants has the right to permit the inspection in his own right* and that the *others have assumed the risk that one of their number might permit the common area to be searched.*

*U.S. v. Matlock*, 415 U.S. 164, 169–71, n.7 (1974) (emphasis added).

The Supreme Court has since affirmed and clarified the law in *Matlock*.

"[T]he 'right' to admit the police to which *Matlock* refers is not an enduring and enforceable ownership right as understood by the private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness . . . ." *Randolph*, 547 U.S. at 120.

Accordingly, "the constitutional sufficiency of a *co-tenant's* consent to enter and search . . . 'rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that any of the co-inhabitant's has the right to permit the inspection in his own right . . . .'" *Id.* at 120 (emphasis added) (quoting *Matlock*, 415 U.S. at 171 n.7). The threshold question for the reasonableness of a search "is in significant part a function of commonly held understanding about the authority that *co-inhabitants* may exercise in ways that affect each other's interests." *Id.* (emphasis added) (citing *Matlock*, 415 U.S. at 164).

As the case law makes clear, a necessary condition for consent, therefore, is a person's actual or apparent status as a "co-tenant" or "co-occupant," *id.* at 106, 111, rather than a mere title-holder. *See id.* at 111. And as the Supreme Court has explained, an officer may not even rely upon the consent of an *occupant* in all circumstances.

Law enforcement may [not] always accept a person's invitation to enter premises. Even when the invitation is accompanied by an explicit assertion that the person *lives there*, the surrounding circumstances could conceivably be

16

such that a reasonable person would doubt its truth and not act upon it without further inquiry. As with other factual determinations bearing upon search and seizure, determination of consent to enter must 'be judged against an objective standard: would the facts available to the officers at the moment . . . 'warrant a man of reasonable caution in the belief'' that the consenting party had authority over the premises? *Terry v. Ohio*, 392 U.S. 1, 21–22 (1968). If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

*Illinois v. Rodriguez*, 497 U.S. 177, 188–89 (1990) (emphasis added).

Turning to the facts of this case,[5] it's clear a constitutional violation occurred.[6] On these facts, the Court can only conclude the following:

1) At all times of the events in question, Denise Boyer did <u>not</u> reside at 103 Wilson Street in Vicksburg, Michigan. Only Marc Boyer had resided there for a few months. (*See, e.g.*, ECF No. 33-5 at PageID.169–70.)

2) Officer Petersen knew that only Marc Boyer, and not Denise Boyer, resided at 103 Wilson Street in Vicksburg, Michigan. Officer Petersen's own sworn testimony confirms this knowledge. He knew "they were going through a divorce" and "were living separately"; he even knew where each resided: Marc Boyer at 103 Wilson Street and Denise Boyer on "the corner of Spruce and Vine Street[s] . . ., two or three blocks away." (ECF No. 33-5 at PageID.169.)

3) Officer Petersen believed he was "justif[ied] for entering the residence" for one relevant reason alone: he was, in his view, "accompanied by the owner of the home." (*Id.*)[7]

---

[5] The Court will acknowledge that some factual disputes, however, do exist. Of course, on summary judgment, the Court must analyze all facts and factual *inferences* in the light most favorable to the Plaintiff—an approach not entirely taken by Defendants in their motion (as is common). *See infra* Part III.A.ii.b. Even when qualified immunity is raised as a defense, the Court still must accept a factual picture in the most favorable sense to the Plaintiff and only then determine if a violation of a clearly established right occurred.

[6] As the Court will demonstrate below, the law is clearly established that an officer cannot rely on a known non-resident's property status owner alone for "consent."

[7] Petersen proffers one additional reason that is ultimately not relevant to "consent," the only exception he relies upon: "being there as a peace officer, [and] mak[ing] sure [Denise was] safe." (*Id.*) However, according to Officer Petersen's testimony, there is no evidence to suggest that Marc Boyer was ever dangerous, made any threats, owned any weapons, or had any arrest record. (*Id.* at PageID.169-70.) And Defendants have expressly eschewed "exigent circumstances" as a reason for entering the residence. *Cf. Randolph*, 547 U.S. 103, 118 (2006) ("But this case has no bearing on the capacity of the police to protect domestic victims."). Accordingly, by Defendants' own admission, entry would not have been justified absent Denise Boyer's actual or apparent authority to consent.

4) Other facts, however, dictated that Denise Boyer's status as an "owner" was not to be relied upon for "actual" or "apparent" authority to give consent to search the premises—most notably, Denise Boyer's own request and frustration at the outset.

    a. First, based upon his own prior interaction with Marc Boyer, Officer Petersen knew that Marc Boyer did not consent to Denise Boyer's entry onto the property without prior notice, arrangements, and his presence.

    b. Second, Officer Petersen knew that Denise Boyer had to "make an appointment for her to come over" to the residence, and Denise Boyer was "frustrated" that Marc Boyer would "cancel on her at the last minute." (*Id.* at PageID.171.)

    c. Third, when Denise Boyer called on that day—she was "frustrated" that Marc Boyer *had* cancelled on her that day. In other words, the Officer knew that Marc Boyer did not consent to Denise Boyer's visit by her own admission.

    d. Fourth, just two days prior to this incident, Officer Petersen and Sergeant Stanfill responded to Denise's call. According to Sergeant Stanfill's narrative (and Officer Petersen was present), he "advised Denise that officers could not determine which items belonged to whom until divorce proceedings were finalized and a court ruled on property ownership." He further "advised that officers would stand by while she collected all her belongings that were not contested." <u>The Officers never entered the home.</u> Why the protocol varied only on the date in question of this case has never been explained.

Here, the Officers involved admit they did not have a warrant and exigent circumstances were not present. (ECF No. 33-4 at PageID.166); *see supra* note 7. Rather, they rely on Denise Boyer's "consent" alone to enter the premises, search for Marc Boyer, and act as "peace officers." (*Id.*)

An objectively reasonable officer armed with Petersen's knowledge would not view this as even a close call. After all, "[t]he Fourth Amendment recognizes a valid warrantless entry and search of premises when police obtain the voluntary consent of an *occupant* who

shares, or is reasonably believed to share, *authority over the area in common* with a *co-occupant* who later objects . . . ." *Randolph*, 547 U.S. at 106 (emphasis added).

Here, Officer Petersen knew that Denise Boyer had not been an "occupant" for at least a couple of months and did not possess "authority over [any] area in common," let alone any part of the home that could have only been considered Marc Boyer's "exclusive quarters." If Denise had even "apparent" authority, there would have been no need for her to "make an appointment" with Marc. Officer Petersen knew Marc Boyer retained complete control over the premises, and he knew Denise was "frustrated" that Marc Boyer withdrew his consent for her to visit on the day in question. She decided to go regardless, and Officer Petersen inexplicably joined in her search for Marc Boyer's person.

Officer Petersen's sole reliance on Denise Boyer as the "owner" and "deed-holder" was not sufficient to conclude that Denise Boyer had "actual" or "apparent" authority over the residence. A "third-party's 'common authority' is not synonymous with a technical property interest." *Randolph*, 547 U.S. at 110 (citing *Katz v. U.S.*, 389 U.S. 347, 352–53 (1967)). On this point, the law has been clear for over four decades.

> The authority which justifies the third-party consent does *not rest upon the law of property*, with its attendant historical and legal refinements, but rests rather on *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched.

*Katz*, 389 U.S. at 352–53 (emphasis added).

Ample other case law supports this constitutional principle, even if the facts of this case are unique. *See, e.g., Chapman v. U.S.*, 365 U.S. 610 (1961) (holding that a landlord could not consent to search of a tenant's home).

Because Denise Boyer, by her own admission, had neither actual nor apparent authority to consent to a search for Marc Boyer, Officer Petersen's reliance on her "consent" was objectively unreasonable; thus, an unconstitutional search occurred. Even assuming, only for the sake of argument, Petersen's reliance on Denise Boyer's authority to "consent" was reasonable to justify entry into the common areas, she clearly did not have the authority to consent to what was a *search for Marc Boyer's person* in what could only be considered his "exclusive quarters." The Court will discuss this point more below.

        **b.** **The law was "clearly established" in the sense that any reasonable officer was "on notice" that a search for the sole resident on the basis of the consent of a non-resident (or other similar circumstances) would not have survived constitutional muster.**

The Court must admit that the "law on whether the law is clearly established" is not crystal clear. *Compare, e.g., Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011) (quoting *Cope v. Heltsley*, 128 F.3d 452, 458-59 (6th Cir. 1997)) ("This standard requires the courts to examine the asserted right at a relatively high level of specificity and on a fact-specific, case-by-case basis.") *with Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (citing *al-Kidd*, 563 U.S. at 741 and *Hope*, 536 U.S. at 741–42) ("[R]eading the[] cases together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established' inquiry is 'fair warning.' While it is apparent that courts should not define clearly established law at a high level of generality, it is equally apparent that this does not mean that 'a case directly on

point' is required. In fact, under *Hope*, a requirement that a prior case be 'fundamentally' or 'materially' similar to the present case would be too rigid an application of the clearly established inquiry.").

This case, therefore, presents some difficulties with respect to the second prong.

On the one hand, the facts of this case do not directly mirror any other.

On the other hand, the "operation of this standard depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified," *Anderson v. Creighton*, 483 U.S. 635, 639 (1987), and since no other "case [is] directly on point," the Court must ultimately answer whether "existing precedent [has] placed the statutory or constitutional question beyond debate," *al-Kidd*, 563 U.S. at 741.

As the Court will explain more fully below, the "existing precedent [has] placed the . . . constitutional question [here] beyond debate." *Id.* That is, the law was clearly established that Officer Petersen could not solely rely on a non-resident's "authority" to consent for a search of Marc Boyer's (exclusive) residence for Marc Boyer's person. *See Randolph*, 547 U.S. at 121 (citing *Matlock*, 415 U.S. at 171 n.7) (emphasis added) ("[T]he constitutional sufficiency of a *co-tenant's* consent to enter and search . . . 'rests . . . on *mutual use of the property by persons generally having joint access or control for most purposes*, so that it is reasonable to recognize that any of the *co-inhabitants* has the right to *permit the inspection in his own right* . . .' . . . . [T]he 'right' to admit the police to which *Matlock* refers is *not an enduring and enforceable ownership right as understood by the private law of property*, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances."). And even assuming,

21

only for the sake of argument, that Denise Boyer was an "owner" with proper authority (or even a "resident"), Denise Boyer could not possibly, on the attendant facts, have had actual or apparent authority to consent to a search of what could only be characterized as Marc Boyer's "exclusive quarters."

Defendants stress that "clearly established" law does not exist to find a constitutional violation on these precise facts. They frame the question as follows:

> Was the law of consent in Fourth Amendment Jurisprudence so sufficiently clear that every reasonable police officer would have understood that entering The House to briefly search to ascertain whether Plaintiff was present, at the request and consent of the record title holder of The House, the spouse of Plaintiff, when there had been no court orders providing Plaintiff with sole possession of The House, and when Plaintiff previously had advised the officers he had no problem with his wife coming to the house to retrieve her items of personal property, violated the Fourth Amendment prohibition against unreasonable searches?

There are two problems with this framing.

First, the question as framed does not reflect the facts in the light most favorable to the Plaintiff. "[T]he spouse of Plaintiff," can be said to have been the "estranged and separated spouse, less than one month away from divorce." The "brief[] search" can be re-characterized as an "intrusive search of the residence for Marc Boyer's person, covering multiple floors and areas," including Marc Boyer's "exclusive quarters." The existence of "no court orders providing Plaintiff with sole possession of The House," can be reframed as "Plaintiff [had] sole possession of The House, as the sole resident, and Marc Boyer advised that the Judge said the 'status quo' should be in place, along with multiple other instances in which Denise Boyer was refused entry." "Plaintiff previously had advised the officers he had

no problem with his wife coming to the house to retrieve her items of personal property" needs to be recast: "Plaintiff previously had advised the officers that, as the sole resident of the home, he ordinarily had no problem giving consent to his wife to retrieve her property from his exclusive residence, provided that proper notice was given, an appointment was made on his own terms."

Second, the question as framed is ultimately too narrow as a matter of law in this case because the "existing precedent [has] placed the statutory or constitutional question beyond debate" under these circumstances. *al-Kidd*, 563 U.S. at 741.

The Eleventh Circuit provides an example of when a court may rely on a more general set of principles when analyzing the "clearly established" prong of qualified immunity:

> When looking at case law, some broad statements of principle in case law are not tied to particularized facts and can clearly establish law applicable in the future to different sets of detailed facts. For example, if some authoritative judicial decision decides a case by determining that 'X Conduct' is unconstitutional *without tying* that determination to a particularized set of facts, the decision on 'X Conduct' can be read as having clearly established a constitutional principle: put differently, the precise facts surrounding 'X Conduct' are immaterial to the violation. These judicial decisions can control 'with obvious clarity' a wide variety of later circumstances.

*Vinyard v. Wilson*, 311 F.3d 1340, 1351 (11th Cir. 2002).

This analysis is sound, and based upon Supreme Court precedent. *See U.S. v. Lanier*, 520 U.S. 259, 271 (1997) (noting that in some instances "a general constitutional rule *in the decisional law* may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful") (internal quotation

marks omitted) (emphasis added). In *Hope v. Pelzer*, the Supreme Court clarified the reach

of *Lanier*:

> Our opinion in *Lanier* thus makes clear that officials can still be on notice that
> their conduct violates established law even in novel factual circumstances.
> Indeed, in *Lanier*, we expressly rejected a requirement that previous cases be
> "fundamentally similar." Although earlier cases involving "fundamentally
> similar" facts can provide especially strong support for a conclusion that the
> law is clearly established, they are not necessary to such a finding. The same is
> true of cases with "materially similar" facts. Accordingly, pursuant to *Lanier*,
> the salient question that the Court of Appeals ought to have asked is whether
> the state of the law in 1995 gave respondents fair warning that their alleged
> treatment of Hope was unconstitutional.

536 U.S. 730, 741 (2002); *see also Baynes*, 799 F.3d at 612–13 ("[R]eading the[] cases

together, the Supreme Court has made clear that the *sine qua non* of the 'clearly established'

inquiry is 'fair warning.'").

In other words, notwithstanding certain case law, *see, e.g., Gribble*, 641 F.3d at 750,

the Sixth Circuit has affirmed that *al-Kidd* did not meaningfully change the landscape laid

out in *Hope*, at least in certain cases. *See Baynes*, 799 F.3d at 613.

Accordingly, the following "black-letter" law should be apparent to any reasonable

officer, based upon established "constitutional principles" in "decisional law," *see Vinyard*,

311 F.3d at 1351.

1) Any reasonable officer knows that mere ownership does not suffice for actual or
apparent authority to consent; a non-inhabitant of a home cannot give consent to
search on the basis of ownership alone. *See, e.g., U.S. v. Matlock*, 415 U.S. 164,
171 n.7 (1974) ("Common authority is, of course, not to be implied from the mere
property interest a third party has in the property. The authority which justifies
the third-party consent does not rest upon the law of property, with its attendance
historical and legal refinements . . . but rests rather on mutual use of the property
by persons generally having joint access or control for most purposes, so that it is

reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that the others have assumed the risk that one of their number might permit the common area to be searched."); *Chapman v. U.S.,* 365 U.S. 610 (1961) (landlord could not validly consent to the search of a house he had rented to another); *Stoner v. Cal.,* 376 U.S .483 (1964) (night hotel clerk could not validly consent to search of a customer's room).

Here, it is undisputed that Officer Petersen knew that Denise Boyer had not resided at Marc Boyer's residence for months, and that Marc Boyer required notice (and his presence and permission) for Denise Boyer to enter the home. Indeed, Marc Boyer had "cancelled" an "appointment" for Denise to stop by because Marc could not be present. Officer Petersen gives only one relevant reason for relying on Denise Boyer's consent: "Denise Boyer owned the deed to the home." That is not at all sufficient.

Not a single Supreme Court case has ever suggested that an officer may rely upon the consent of a person who does not reside, inhabit, or occupy a residence, because under those circumstances, "no common authority c[an] sensibly be suspected." *Randolph,* 547 U.S. at 112. The Supreme Court has reaffirmed, time and time again, the idea that consent is confined to cases where a person resides, inhabits, or occupies a home (actual authority), or is reasonably believed to have been a resident, inhabitant, or occupant (apparent authority). And this is not the case where a landowner returns to his or her residence after a long period of absence—Denise and Marc were "separated" until divorce was finalized.

True, the precise facts of this case have not been presented to the Supreme Court, but "consent" is an *exception* to the warrant requirement, and not to be sloppily relied upon. *Bustamonte,* 412 U.S. at 219 (quoting *Katz,* 389 U.S. at 357) ("[A] search conducted without a warrant" is "'subject only to a few specifically established and well-delineated exceptions.'").

The fact that the Supreme Court has never even hinted that "consent" under these circumstances might plausibly be constitutional matters to this Court.

>   2) In certain circumstances, an officer may rely on the fact that a couple is married—or even is perceived to be married—to rely on a spouse's consent (in the absence of the other spouse). However, that is only true "in the absence of reason to doubt that the regular scheme was in place." *See Randolph*, 547 U.S. at 111–12 (citing *Matlock*, 415 U.S. at 166). A person's "common authority that counts under Fourth Amendment" has "limits," particularly where "specialized tenancy arrangements" are "apparent to the police." *Id.* at 110. Accordingly, the "reasonableness of such a search is in significant part a function of commonly held understanding about the authority that *co-inhabitants* may exercise in ways that affect each other's interests. *Id.* at 111. But where "no common authority could sensibly be suspected," *id.*, such as where a person only asserts the right to invite police in based upon mere ownership (a landlord or even a temporary host), the Officer cannot reasonably rely on any sort of "consent" of the third party.

Here, admittedly, one distinguishing factor that cuts in the Officer's favor is the fact that Marc and Denise Boyer were still technically married. However, Officer Petersen knew they were nearly divorced, and indeed, the final judgment entered less than one month later. And viewing the facts in the light most favorable to Marc Boyer, the couple was legally "separated." (ECF No. 28-2 at PageID.97; ECF No. 28-6 at PageID.119.) Further, in his sworn testimony, the Officer never cited the fact they were still "married" as a reason for believing Denise Boyer had authority to consent to the Officer's search. Rather, the Officer stated that the sole relevant reason was because Denise Boyer "owned the property."[8]

---

[8] And even if a dying "marriage" was cited, the Supreme Court has suggested that if there is ample "reason to doubt that the regular scheme was in place," *Matlock* "place[s] [a] burden on the police to eliminate the possibility of atypical arrangements." *Randolph*, 547 U.S. at 112 (citing *Matlock*, 415 U.S. at 164).

Officer Petersen seems to suggest that the fact that Denise Boyer was retrieving her things is relevant to the question of consent. However, the precise purpose of the Officer's "search" was to try to find Mr. Boyer—not to assist Denise Boyer with retrieving her things. Suppose that Denise Boyer wanted to confront Marc Boyer and have a discussion, rather than retrieve her things; accordingly, she wanted the Officer along for a "peace call." Would the Officer have believed Denise Boyer had the actual or apparent consent to enter the home under those circumstances? Not likely, but even if so, Officer Petersen is using an irrelevant "purpose" for Denise's entry to determine whether or not Denise Boyer had "actual" or "apparent" authority to *invite the Officer inside to search for Marc Boyer.*

3) **Even if an individual has a "technical property interest" to enter—or indeed, even occupy!—a home, she does not necessarily have the right to give consent to search for a person "in their temporary quarters."** *Minnesota v. Olson,* **495 U.S. 91, 99 (1990) (holding that even an overnight houseguest has "a legitimate expectation of privacy in [his] temporary quarters because 'it is unlikely that [the host] will admit someone who wants to see or meet the guest over the objection of the guest.'").**

In *Olson,* 495 U.S. at 91, the Supreme Court "held that overnight houseguests have a legitimate expectation of privacy in their temporary quarters because 'it is unlikely that [the host] will admit someone who wants to see or meet with the guest over the objection of the guest.'" *Randolph,* 547 U.S. at 112 (quoting *Olson,* 495 U.S. at 99). "If that customary expectation or courtesy or deference is a foundation of Fourth Amendment rights of a houseguest, it presumably should follow that an inhabitant of shared premises may claim at least as much, and it turns out that the *co-inhabitant naturally has an even stronger claim.*" *Id.* (emphasis added).

Here, viewing facts favorable to Plaintiff, Officer Petersen entered areas into the home (including the upstairs) that were indisputably Marc Boyer's exclusive "quarters" at the time of entry. Even if those quarters were "temporary," it matters not. *See id.* The question of whether Denise Boyer owned the home as a matter of property law is separate and apart from whether she had the authority to consent to the Officer's search for Marc Boyer's person in his "quarters"—a fairly exhaustive and intrusive search, no less, when the facts are viewed in the light most favorable to Marc Boyer.

Marc Boyer was much more than a "houseguest"; he was *the sole resident*, and Officer Petersen knew this at the time of entry. A search for *Marc's person* in that home on the basis of Denise Boyer's "consent" was not at all reasonable—particularly in light of Denise Boyer's angry phone call that Marc Boyer had withdrawn his consent for her to visit the home and retrieve belongings on the day in question. And given the Boyers' tumult, any officer should arguably have given even greater deference to Marc Boyer than he would have to Denise Boyer's houseguest. *See Randolph*, 547 U.S. at 112.

Finally, the Court must distinguish the cases that Defendants cite.

First, in *U.S. v. Roark*, 36 F.3d 14 (1994), the Sixth Circuit in dictum noted that a sister "had the authority to consent" to a search of her brother's house, which she owned on the same property as her other home, by virtue of "her ownership or common control." *Roark*, 36 F.3d at 17. This statement of law was dictum because the Court found that the sister did *not* consent, after all—and other facts not discussed could have made the difference in that case, such as the sister residing elsewhere on the same property. True, the Sixth

Circuit subsequently held that sheriff's deputies were entitled to qualified immunity in 2002 because of *Roark*, but the Sixth Circuit at that time stated:

> [T]his is not to say that we are in agreement that *Roark* was correctly decided. *Roark* fails to provide a rationale from the Supreme Court's concept of 'common authority' as set forth in *Matlock*, which defines 'common authority' as
>
>> the mutual use of the property by persons generally having joint control for most purposes so that it is reasonable to recognize that any of the co-inhabitants has the right to permit the inspection in his own right and that others have assumed the risk that one of their members might permit the common area to be searched.
>
> *Matlock*, 415 U.S. at 172. If *Roark* were *generally applied*, then, for example, an absentee landlord would have the ability to consent to the search of a tenant's residence. **That is not the law.**

*Willhelm v. Boggs*, 290 F.3d 822, 826 (6th Cir. 2002) (emphasis added).

Accordingly, even if qualified immunity was proper in *Boggs*, the Sixth Circuit sent a clear signal and affirmed the appropriate standard going forward, as dictated by the Supreme Court—the *Matlock* standard. Moreover, here, unlike the facts in *Roark*, Denise Boyer did not reside on the same property, and she sent the clearest of signals to Officer Petersen on the day he chose to search the home: Marc Boyer, the sole resident of the home, "cancelled" an appointment made with Denise Boyer—and hence, withdrew his consent for Denise Boyer to visit his residence.

More importantly, the subsequent Supreme Court case of *Randolph*, which post-dates *Roark*, re-affirms the "common authority" standard set forth in *Matlock*.

> [T]he constitutional sufficiency of a co-tenant's consent to enter and search . . . "rests . . . on mutual use of the property by persons generally having joint access or control for most purposes, so that it is reasonable to recognize that

any of the co-inhabitants has the right to permit the inspection in his own right . . ." . . . . [T]he "right" to admit the police to which *Matlock* refers is not an enduring and enforceable ownership right as understood by the private law of property, but is instead the authority recognized by customary social usage as having a substantial bearing on Fourth Amendment reasonableness in specific circumstances.

*Randolph*, 547 U.S. at 121 (citing *Matlock*, 415 U.S. at 171 n.7).[9]

The Court must re-affirm *Matlock* as the operative standard that explicitly rejects an officer's ability to solely rest on "the private law of property" when ascertaining whether authority to consent exists; the case law, therefore, provides a clear answer that should have been apparent at the time to Officer Petersen.

Here, unlike the facts in *Matlock*, there was all the "reason [in the world] to doubt that the regular scheme was in place" to support Denise Boyer's "apparent authority." *Randolph*, 547 U.S. at 112 (citing *Matlock*, 415 U.S. at 164). Denise Boyer did not reside at Marc Boyer's residence. She had lived in a separate residence for months. Marc Boyer had previously communicated that she was not to be on the property without notice. On the day in question, Marc Boyer had cancelled an "appointment" for Denise Boyer to retrieve items from the residence. Denise Boyer was frustrated at this cancellation, and decided to go

---

[9] The other case that Defendants rely upon, *Barajli v. Huron Twp.*, 365 F.3d 501 (6th Cir. 2004), is factually distinguishable. In that case, the Officers had responded to a previous, brutal domestic violence incident at the home in question. "When [the wife] provided the police with a written statement after she was allegedly beaten . . ., she listed the address of [her husband] as her place of residence." Thus, "[t]he police therefore knew that [the wife] had resided at the house in the recent past," and "she possessed a garage-door opener, which she used to gain access to the house." *Id.* at 506. However, in this case, Denise Boyer *admitted* she did not have permission to enter the house on that very day—she had called to make arrangements with Marc Boyer, and he had "cancelled" on her. She relayed this information to the police, who could have only concluded that Marc Boyer did not consent to a search of his home on that day. In addition, the police knew that Denise Boyer did not reside there—even in the recent past—based upon the prior call, common knowledge, and Denise Boyer's own statements. Nonetheless, Officer Petersen solely relied upon the fact that Denise Boyer "owned" the home as a basis for the search.

anyways. Officer Petersen knew all of this—and yet disregarded it all based on one reason alone: Denise Boyer's name was on the "deed," and thus she "owned" the property.

### iii.    Chief Campbell is entitled to qualified immunity.

Chief Campbell, on the other hand, is entitled to qualified immunity.

First, as the Chief of the Village of Schoolcraft, Campbell responded at the request of Officer Petersen. Thus, he can be said to have had no background information that Officer Petersen enjoyed. Further, when he arrived at the scene, Officer Petersen did not give him the entire picture. Finally, Chief Campbell *at most* only set one foot inside the home. (ECF No. 33-4 at PageID.164 ("I stepped just inside the threshold of the doorway . . . .").) Any "search" was *de minimis*, and Campbell relied upon Petersen's judgment and jurisdiction over the matter. *Cf. U.S. v. Jacobsen*, 466 U.S. 109, 125–26 (1984) (citing *Cardwell v. Lewis*, 417 U.S. 583, 591–92 (1974)) ("[B]ecause a trace amount of material was involved, the loss of which appears to have gone unnoticed by respondents . . . the 'seizure' could, at most, have only a *de minimis* impact on any protected property interest.").

Chief Campbell was not completely in the dark, however. He testified that Officer Petersen had relayed the following information:

> He told me that Mrs. Boyer had contacted their office and wanted an officer to come stand by as a peace officer. That she was going through a divorce with Mr. Boyer. That they would be soon divorced, I believe in September; that they were currently separated. That there had been a couple two or three attempts at getting some property that they had both agreed on, and that Mr. Boyer wasn't available, and that it was that particular day on the 13th, that was supposed to occur, where she was supposed to get some of the property. And she told Officer Petersen she was just gonna go get the property and she wanted an officer to stand by. And Officer Petersen told me that he name was still on the deed to the property, and that he wanted at least one other officer . . . there.

(*Id.* at PageID.163.)

Chief Campbell also testified that he, at least at some point, knew that Denise Boyer was not then an inhabitant of the Wilson residence. (*Id.* at PageID.163.) But it's not clear that Campbell knew that prior to setting his foot inside the threshold. Further, he was there to provide back-up; he did not conduct a "search" for Marc Boyer's person, rooting across his home like Officer Petersen; he only wanted to make sure he was "within hearing distance if there [were] . . . any issues or problems." (*Id.* at PageID.165.)

Again, at most, Chief Campbell briefly "stepped inside the threshold of the doorway." (*Id.* at PageID.164.) That may not even suffice for a constitutional violation given the circumstances, *see Jacobsen*, 466 U.S. at 125, but regardless, an officer armed with Campbell's limited knowledge would not have been "on notice" that clearly established law prohibited such a minor step.

### B. Count II (Common Law Trespass)

"Recovery for trespass to land in Michigan is available only upon proof of an unauthorized direct or immediate intrusion of a physical, tangible object onto land over which the plaintiff has a right of exclusive possession." *Adams v. Cleveland-Cliffs Iron Co.*, 602 N.W.2d 215, 221 (Mich. Ct. App. 1999). The Sixth Circuit recently sketched out the framework for governmental immunity under state law in the context of intentional torts:

> In *Odom v. Wayne Cty.*, 760 N.W.2d 217, 228 (Mich. 2008), the Michigan Supreme Court stated that the proper method for determining whether governmental immunity applies to intentional torts, such as assault and battery, is to apply the test set forth in *Ross v. Consumers Power Co.*, 363 N.W.2d 641, 647 (Mich. 1984). Under the *Ross* test, an employee enjoys a right to immunity if (1) the employee undertook the challenged acts during the course

of his employment and was acting, or reasonably believed he was acting, within the scope of his authority; (2) the employee undertook the challenged acts in good faith or without malice; and (3) the acts were discretionary, rather than ministerial, in nature. *Odom*, 760 N.W.2d at 228. Defendants bear the burden of establishing their entitlement to immunity from plaintiff's state-law claims. *Id.* at 227–28.

. . . .

Unlike qualified immunity under federal law, which uses an objective standard, '[t]he good-faith element of the *Ross* test is subjective in nature. It protects a defendant's honest belief and good-faith conduct with the cloak of immunity while exposing to liability a defendant who acts with malicious intent.' Therefore, '[t]he proponent of individual immunity must establish that he acted without malice.' *Id.* at 225. *See also Miller v. Sanilac Cty.*, 606 F.3d 240, 254 (6th Cir. 2010 (applying Michigan law) ("The only factor at issue here is 'good faith,' which is defined as 'without malice.'").

*Bletz v. Gribble*, 641 F.3d 743, 757 (6th Cir. 2011).

Here, Plaintiff alleges that a jury could conclude that "malice" existed on Officer Petersen's part because the jury "could infer that Officer Petersen had some malice against Mr. Boyer" because he was "aware of complaints Mr. Boyer had made against the police chief of the Village of Vicksburg and that, as a village council member, he had advocated that the police department's membership be reduced." (ECF No. 33 at PageID.146.)

However, under Michigan law, "Plaintiff does not bear the burden of producing direct evidence that the Officers acted with malice." *Scozzari v. City of Clare*, 723 F. Supp. 2d 974, 978 (E.D. Mich. 2010). Here, Officer Petersen has not concluded "as a matter of law" that he "acted in good faith." *Id.* As the Court has demonstrated, the entry into the home and search for Marc Boyer's person lacked any objectively reasonable basis.

Although a close call, a jury could conclude either way. There are factual disputes that would make summary judgment improper at this juncture for the trespass claim because a

jury *could* conclude that Officer Petersen's search of Marc Boyer's residence for his person was not based upon "a good-faith belief that [Denise Boyer had the authority to consent to the entry]." *Odom*, 760 N.W.2d at 229. Moreover, as the record demonstrates, Officer Petersen's actions on the day in question are patently inconsistent with the way every other incident was handled with the Boyers by other officers, with and without Officer Petersen present. Why Officer Petersen deviated from protocol on the day in question is open to interpretation. Since the inquiry is subjective under Michigan law, and not objective, a jury determination is often necessary to untangle factual disputes.

A jury could not conclude, however, that Chief Campbell acted with "malice" in placing one foot past the threshold; he was a back-up officer from another community who did not have all of the information available.

## III.  CONCLUSION

For the reasons stated above, Defendants' Motion for Summary Judgment is denied with respect to Officer Petersen and granted with respect to Chief Campbell on both counts.

## ORDER

For the reasons stated in the accompanying opinion, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion for summary judgment. Claims against Bryan Campbell are dismissed, and he is terminated from this case. Claims against Mark Petersen remain and shall proceed to trial.

**IT IS SO ORDERED**.

Date:    October 27, 2016                        /s/ Paul L. Maloney
                                                 Paul L. Maloney
                                                 United States District Judge